UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MARGARET GRIFFIN, | ) | Case No. 1:06 CV 1703 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | MEMORANDUM OPINION |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) ) | Magistrate Judge James S. Gallas |

The plaintiff, Margaret Griffin, has been engaged in protracted administrative and judicial proceedings to prosecute her claim for supplemental security income under Title XVI of the Social Security Act. She filed her claim on December 17, 1999 and following multiple remands for various reasons it is now before this court to determine whether remand is necessary or judgment can be entered in favor of either Griffin or the Commissioner. Following remand ordered by Judge Aldrich, an administrative hearing was held (TR. 740-768) followed by the administrative denial of SSI benefits on July 8, 2005 in the decision written by an ALJ (TR. 389-414). This decision became the final decision of the Commissioner when the Appeals Council denied Griffin's request for review. See 20 C.F.R. §416.1481.

*Administrative Decision*:

The Commissioner found that Griffin suffered severe impairment due to seizure disorder, depression, right optic neuropathy, right ear hearing loss, personality disorder and cognitive disorder not otherwise specified (TR. 413). These impairments were found to be nondisabling based on the ALJ's hypotheticals to a vocational expert which incorporated the testimony of medical advisor Dr.

1:06 CV 1703                                                    2

Ross from a prior administrative hearing (TR. 676-732). Based on this evidence, the administrative conclusion was that Griffin could adapt to light/medium level work that exists in significant numbers in the national economy (TR. 292, 414). Griffin challenges this conclusion raising four contentions:

> I.     The ALJ committed legal error when he used impermissible evidence to reject the opinion of the treating neurologist in that he relied upon evidence outside the record and substituted his own lay opinion for that of the medical experts.

While the foregoing contention is vague Griffin presents seven subarguments. As a preamble Griffin explains that Judge Aldrich, who formerly remanded this matter, instructed the ALJ to give controlling weight to the opinion of Dr. Winkelman, who concluded that Griffin was disabled due to her dementia, unless the ALJ found that the doctor's opinion was in conflict with other substantial evidence of record or not supported by detailed objective criteria or documentation (TR. 448). Well this matter is before this court because the ALJ followed Judge Aldridge's recommendations and found that Dr. Winkelman's opinion was in conflict with other substantial evidence in the record and not supported by detailed objective criteria or documentation (TR. 404-05).

The first of Griffin's objections to the ALJ's reasoning is that he resorted to "DSM-IV-TR," which was not in evidence,to explain what Dr. Davis meant by his diagnoses of dementia, depressive disorder not otherwise specified and impulse control disorder not otherwise specified (TR. 394-395). There is nothing objectionable to the ALJ's taking judicial notice of "DSM-IV-TR."[1] Dr. Davis referred repeatedly to "DSM-IV-TR" coded sections in his report's

---

[1] The parties repeatedly refer to "DSM-IV" in their arguments which is a shorthand reference to American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th Ed. Text Revision, 2000), commonly referred to as DSM-IV-TR™.

1:06 CV 1703                                         3

conclusion, so naturally judicial notice was required for the ALJ to comprehend and to provide a frame of reference to what otherwise would have been meaningless numerical references.  See TR 135-136.**²**

Griffin's second objection is that the ALJ was not sure if dementia was a mental disorder and the ALJ again utilized "DSM-IV-TR" to determine whether dementia was an actual mental disorder and analyzed the criteria of that disorder to place it under the Appendix I criteria (See TR 401 and 405).  Also in his analysis Griffin complains that the ALJ referred to outside sources to define medical terms (TR. 394, 395, 401).  Again based on the reasons in this argument there was nothing objectionable.  What Griffin is essentially objecting to is the ALJ's thorough scrutiny of the medical evidence and notably she does not object on the basis of a mischaracterization of the medical condition due to inaccurate definition.

Griffin's fourth, fifth and sixth objections, though, are at the heart of her first contention. In her fourth argument Griffin argues that the ALJ used "DSM-IV-TR" to discredit the psychological opinion of Dr. Hitchcock who psychologically treated Griffin as she was hospitalized in November 2004.  In her fifth objection she states the ALJ relied heavily on lay knowledge of "DSM-IV-TR" to analyze and interpret the medical opinions of Drs. Winkelman, Davis and Hitchcock to justify his conclusion that Griffin was not suffering from dementia, (TR. 404) and

---

² "DSM-IV-TR" explains that, "The official coding system in use as of publication of "DSM-IV-TR" is the *International Classification of Diseases,* 9th Revision, Clinical Modification (ICD-9-CM)," "DSM-IV-TR" at 867.

1:06 CV 1703                                          4

finally, in her sixth objection, that the ALJ used lay opinion and "DSM-IV-TR" to reject Dr. Winkelman's opinion and not to give it controlling weight.

Although the ALJ relied on Dr. Hitchcock's diagnosis of cognitive disorder not otherwise specified as one of Griffin's severe impairment (TR. 653, 413), he criticized Dr. Hitchcock's reference to "organic mood disorder 294.9 . . . and cognitive impairment, but the code 294.9 describes cognitive disorder not otherwise specified in "DSM-IV-TR" (TR. 402).

The ALJ's clarification and criticism was fair. Mood disorder due to a general medical condition is coded 293.83 and as explained, " . . . a diagnosis of Mood Disorder Due to a General Medical Condition may be given in addition to a diagnosis of dementia if the mood symptoms are a prominent part of the clinical presentation (*e.g.*, Mood Disorder Due to Alzheimer's Disease," "DSM-TR-IV" at 401, 403. Dr. Hitchcock was not compounding her diagnosis to the diagnosis of dementia from Dr. Winkelman, so her statement was unclear. Moreover, the coded reference to cognitive disorder is far more consistent with the record. The ALJ did not err in clarifying this aspect to Dr. Hitchcock's diagnosis.

As for the fifth and sixth subarguments, Dr. Winkelman, Griffin's treating psychologist and neurologist since 1997 diagnosed post-traumatic dementia (TR. 209). The ALJ stated that only two medical professionals who examined Griffin had diagnosed her with dementia, Dr. Davis and Dr. Winkelman (TR. 404). He stated that Dr. Smith, Dr. Vargo and Dr. Hitchcock did not diagnose dementia and instead Dr. Hitchcock said that Griffin suffered from dysthymia as well as"organic

1:06 CV 1703                               5

mood disorder 294.9... and cognitive impairments." (TR. 404). The ALJ then quoted passages from "DSM-IV-TR" that described both cognitive disorder not otherwise specified dementia and concluded that there was no objective evidence in any of Dr. Winkelman's records to support his statement that Griffin had dementia. The ALJ relied on his conclusion that this diagnosis was inconsistent with the diagnoses offered by Drs. Vargo, Smith and Hitchcock, the opinions of Dr. Ross, and two nonexamining state agency psychologists (TR. 405). The ALJ concluded that "Griffin's organic brain disorder is best described as a cognitive disorder not otherwise specified." *Id.*

Dementia was diagnosed by a consultative psychologist Dr. Davis (TR. 131-36) and the treating physician, Dr. Winkelman (TR. 209). The ALJ would not recognize dementia at step two of the five step sequential evaluation under 20 C.F.R. §416.920(a)(4). Closer scrutiny of Dr. Hitchcock's diagnosis of cognitive disorder not otherwise specified does not show inconsistency with the opinions from the treating physician Dr. Winkelman nor the other consultative psychologist, Dr. Davis.

Dr. Hitchcock's findings appear in her treatment notes from 2004 during Griffin's hospitalization for meningitis (TR. 653). Dr. Hitchcock reported extensively on the prior evidence of Griffin's head trauma (TR. 651), but this doctor's impression, as mentioned earlier, was "organic mood disorder 294.9 with [illegible] and cognitive impairments, dysthymia 300.4." The coded provision from "DSM-IV-TR" 294.9 is linked to the diagnosis of cognitive disorder not otherwise

1:06 CV 1703                                        6

specified which the ALJ adopted but which is not far removed from dementia. Dementia due to head trauma is coded 294.10. See "DSM-IV-TR" p. 164.

The ALJ expends much effort in his reading of "DSM-IV-TR" in distinguishing dementia from cognitive disorder not otherwise specified, but "DSM-IV-TR" explains, "[i]ndividuals may present with some but not all of the symptoms of dementia. Such presentation should be coded as **Cognitive Disorder not otherwise specified."** (emphasis in original). "DSM-IV-TR" p. 153. In fact the ALJ noted in the decision that an example of cognitive disorder not otherwise specified includes postconcussional disorder (TR. 404; "DSM-IV-TR" p. 180). The major difference between the two is that "if the head trauma results in dementia (e.g., memory impairment and at least one other cognitive impairment), postconcussional disorder should not be considered." "DSM-IV-TR" at 761. So there is a fine line between the two diagnoses, and the decision to diagnose cognitive disorder not otherwise specified, is a more conservative diagnosis as opposed to the dementia due to head injury but this diagnosis in Dr. Hitchcock's opinion does not rule out dementia since the two are not inconsistent.

*Requirements of Full and Fair Analysis:*

"Medical opinions are statements from physicians and psychologists . . . that reflects judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis . . ." 20 C.F.R. §416.927(a)(2). As *Wilson v. Commissioner* instructs, the ALJ must give the opinion from the treating source controlling weight if he finds the opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with

1:06 CV 1703                                                                 7

the other substantial evidence in [the] case record." *Id.*, 378 F.3d 541, 544 (6th Cir. 2004) quoting 20 C.F.R. §416.927(d)(2). On this last point, supportability of the medical opinion of disability has long been a key factor in determining how much weight to give the opinion. The ALJ is not bound by a conclusory opinion which is unsupported by detailed objective criteria, or when there is substantial medical evidence to the contrary. *Cutlip v. Secretary*, 25 F.3d 284, 286 (6th Cir. 1994); *Cohen v. Secretary*, 964 F.2d 524, 528 (6th Cir. 1992); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984). This has been incorporated into the regulatory scheme under §404.1527(d)(2) and its SSI counterpart §416.927(d)(2), which require that the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." This includes reporting : (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)). The ALJ *must* apply the regulatory factors of §416.927(d) when explaining why the treating source was not accorded controlling weight. *Bowen v. Commissioner of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007), quoting *Wilson*, 378 F.3d at 544. The ALJ also must consider the medical opinions "together with the rest of the relevant evidence." See 20 C.F.R. §416.927(b).

This final point is especially important here when a treating physician and two examining physicians have found dementia or a dementia-like condition. Moreover pursuant to §416.927(d)(2) the ALJ was required to consider the treatment relationship and give more weight to the opinions from the treating sources. Obviously Dr. Winkelman had a longitudinal relationship with Griffin which could account for his diagnosis of post-traumatic dementia as opposed to post-concussional disorder.

1:06 CV 1703                                                      8

The ALJ did point out that Dr. Vargo and Dr. Smith did not diagnose dementia. Dr. Vargo treated Griffin from 1990 through July 1997 before the SSI application was filed (TR. 127-130). However Dr. Vargo lacked Dr. Winkelman's specialization. It was Dr. Vargo's referral which resulted in treatment by Dr. Winkelman (TR. 128). Dr.Vargo reported on Griffin's seizure disorder but did note mild short term memory impairment. Her diagnosis was traumatic brain injury and seizure disorder (TR. 129). Again reviewing the record as a whole, Dr. Vargo's diagnosis of head injury and memory loss are not inconsistent with the diagnosis of dementia due to head trauma.

Next, the ALJ relied on the lack of diagnosis of dementia from Dr. Smith. Dr. Smith saw Griffin in May 2002 and performed a consultative neuropsychological testing over the course of two days (TR. 224-235). Dr. Smith provided no diagnosis but did note "significant head injury occurred ten years ago. Continuing signs of slowed eye-hand coordination are still present with more obvious problems involving blurred vision of the right eye, loss of hearing in the right ear, continued possibility of an occurrence of grand mal and petit mal seizures and frequent headaches." (TR. 232). Dr. Smith's findings are certainly supportive of dementia because the criteria of dementia include memory impairment plus an additional cognitive disturbance such as apraxia, which is "impaired ability to carry out motor activities despite intact motor function." See "DSM-IV-TR" p. 168. Consequently the record when viewed as a whole including these other decisions, there is no inconsistency and the ALJ lacks substantial evidence to reject Dr. Winkelman's and Dr. Davis' opinions that Griffin's condition included the diagnosis of dementia due to head injury. The ALJ erred by concluding on the basis of only the lack of Dr. Winkelman's own findings in the record that there was no support or at least inconsistent support for the diagnosis of dementia (TR. 405).

1:06 CV 1703                                         9

Accordingly, Griffin's fifth and sixth arguments objecting to the ALJ's decision are certainly correct. The ALJ interjected his own lay opinion into this matter without a full understanding of the differences in the medical impairment. This is certainly a situation where medical expertise should have been the foundation of the decision, but unfortunately it was not. The ALJ lacked substantial evidence to exclude dementia as one of Griffin's severe impairments. This error, though, is not dispositive of this appeal.

> II.  The ALJ committed legal error when he had failed to give controlling weight to the opinion of Dr. Winkelman that Ms. Griffin suffered from disabling dementia and would miss a lot of time from work because of her impairments.

It is Griffin's second contention which is dispositive of this matter. Dr. Winkelman consistently stated that Griffin's dementia made her unable to work or hold any job (TR. 169, 211, 238). He felt that her impairments and the side effects of medication required her to take frequent unscheduled breaks and she would be absent from work for more than four days per month (TR. 211-21, 222-223). Griffin's prior treating physician, Dr. Vargo, had also reported that due to seizure medication that Griffin would have a need for frequent rests (TR. 129). Griffin argues that no other doctor addressed her need for frequent rests and unscheduled breaks or her inability to show up for work and on this issue Dr. Winkelman is not inconsistent with the evidence because there is no opinion in the record which rebuts his assessment. This argument leads to the question whether or not Dr. Winkelman's opinion of disability is binding upon the Commissioner. The ALJ engaged in the thorough destruction of Dr. Winkelman's opinions in the decision which appears for the most

1:06 CV 1703                                              10

part on pages 408 through 410 of the transcript. Griffin contends that Dr. Winkelman's (perhaps somewhat flippant) opinion that she is "too demented to work" should be given controlling weight.

A point raised by the ALJ though was supportability from the medical evidence records as a whole (TR. 409). §404.1527(d)(2) and its SSI counterpart §416.927(d)(2) require that the treating physician's opinion must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques." This includes reporting: (1) treatment provided; (2) extent of examination; and (3) testing (20 C.F.R. §404.1527(d)(2)(ii) and §416.927(d)(2)(ii)). And see *Wilson*, 378 F.3d at 544.

Here the ALJ had numerous reasons pointing out among other factors that Dr. Winkelman's statement that Griffin had poor memory and sustained concentration and persistence was not consistent with evaluations done by Dr. Davis and Dr. Smith though Dr. Winkelman's May 2001 statement said Griffin's seizures made her "too tired and confused to care for herself" because there was no medical or lay evidence showing that the residuals from the seizures lasting more than a day or two.

Further, the ALJ did not accept Dr. Winkelman's opinion that Winkelman would need to take a 15-minute break each time she worked for 30 minutes and would be required to miss more than four days of work each month. The ALJ pointed out the only side effect that Dr. Winkelman indicated in his notes due to seizure medication was dizziness and not fatigue (TR. 409). The record showed that Griffin had reportedly told Dr. Winkelman on several occasions that she was not

1:06 CV 1703                                                11

experiencing any dizziness or drowsiness (TR. 409-10). In addition when she saw Dr. Davis she did not complain that she suffered from fatigue. The ALJ also based his decision on the finding that Dr. Winkelman tended to exaggerate. It was pointed out that Dr. Winkelman reported in May 2001 that Griffin had one or two seizures a month when in fact his records show that she had eight seizures in the 45 months that she was under his care, an average of one every 5.65 months (TR. 397). Dr. Winkelman also reported that he saw Griffin once every two or three months when his own records showed that he had seen Griffin 12 times since August 15, 1997, an average of once in every 3.75 months (TR. 397).

Next with respect to the break periods and the need to miss over four days per month, Dr. Winkelman did not even indicate which impairment would cause her to miss work (TR. 398). Moreover the ALJ noted that Griffin told the doctor in April 2002 that she had not had any seizures since she started taking Tegretol-XR and that she had only had one headache per month which she rated as a "3" on a scale of 1 to 10 (TR. 398). Dr. Winkelman had stated that he doubted that Griffin's headaches were related to her anti-seizure medication. *Id.* Further despite the statements by Dr. Winkelman of Griffin's reduced abilities for memory, persistence, pace, concentration, etc., objective testing conducted by Dr. Smith in May 2002 contradicted this statement. As the ALJ noted, Dr. Smith reported that Griffin did well obtaining scores in the average range across the board in immediate memory and on delayed memory (TR. 229, 399). She further did well in the working memory score with her highest scores on a test as letter number sequency in a spatial span both of which required the highest levels of concentration and a manipulation of inner symbols (TR. 229, 399). The ALJ also relied on the fact that Dr. Vargo had not examined Griffin since 1997, three

1:06 CV 1703                                                        12

years prior. Thus the ALJ had substantial contradictory evidence in the record which objectively demonstrated that there was inconsistency with Dr. Winkelman's opinion of fatigue and that Dr. Winkelman had made incorrect assumptions (TR. 409). Accordingly the ALJ's decision shows that he did consider the necessary factors and did give "good reason" to reject Dr. Winkelman's opinion of total disability. There was no "supportability" as required by §416.927(d)(3) for the opinion that Griffin would be unable to work due to the need to take days off or require frequent rest breaks. The record lacked "medical signs and laboratory findings" to support the opinion, and medical notes indicated that Griffin was not experiencing drowsiness, and she did not complain of fatigue to Dr. Davis.

> III.    The ALJ failed to fully and fairly evaluate all the evidence in the record as of the date of the hearing in that he failed to determine the severity of Ms. Griffin's meningitis and the resultant functional limitations.

Griffin was hospitalized between October 22, 2004 and November 24, 2004 because of meningitis due to bacterial infection (TR. 402). At that time Griffin had a seizure in the emergency room and it was suggested that the seizure may have been the result of a combination of both her prior seizure disorder as well as meningitis. *Id.* The ALJ noted that at the time of discharge Griffin was noted to be having trouble reading, writing and speaking and have impaired attention and organization as well as diminished memory and verbal problem solving. Griffin had problems using her left side and needed assistance with all activities of daily living (TR. 403). Griffin relies on the fact that she was in a nursing home and had cognitive loss and other problems but she claims there is no evidence that these impairments or conditions improved.

1:06 CV 1703                                              13

The ALJ did note Griffin's bout with meningitis and discussed his reasons why he believed her condition had improved, including that she regained her ability to walk independently.  It is noted that she had some memory problems but she had no problems with her attention or her ability to communicate, ability to care for her personal needs had also greatly improved by December 4, 2004 and she had no problems maintaining balance or using her upper and lower extremities. Further, in the December 4, 2004 report Griffin was not having any headaches and she subsequently refused speech therapy that had been offered several times during the month of December 2004 (TR. 403).  Moreover the ALJ thought it was significant that it was revealed that the January 24, 2005 hearing that Griffin had not had any followup medical treatment since she was released from the nursing home.  *Id.*  Thus there was evidence of improvement and consequently the ALJ's decision was supported by substantial evidence.

> IV.     The ALJ lacked substantial evidence to conclude that Ms. Griffin had the residual functional capacity to engage in substantial gainful activity.

This contention relates back to Dr. Winkelman's allegedly "consistent" opinion that Griffin would require frequent unscheduled breaks and would miss more than four days of work every month because of her impairments (TR. 211-12, 222-23).   Griffin again argues that there was no evidence that conflicted with this statement in the file, that the ALJ erroneously declined to defer to this opinion, and instead formulated a different residual functional capacity, which vocational expert testimony indicated that Griffin was capable of engaging in substantial gainful activity.  However, as discussed earlier, the ALJ gave good reasons for rejecting Dr. Winkelman's opinion

1:06 CV 1703                                                          14

regarding four absences per month and the need for an unscheduled break.  Moreover the medical opinions of the medical advisors, Dr. Ross, Dr. Smith and Dr. Davis supported the restrictions assessed by the ALJ, namely restricted interaction with the public and coworkers and limitations to simple tasks with no production quotas.  As the Commissioner argues, the ALJ was within his "zone of choice" in adopting the opinions from the other examining sources.

The vocational expert relied on the opinion of the medical advisor, Dr. Ross, and presented a hypothetical question to a vocational expert based on that opinion (TR. 710-11, 732-39, 292).  A vocational expert's opinion cannot constitute substantial evidence unless the expert <u>precisely</u> considers the particular physical and mental impairments affecting claimant.  *Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987); *McMillan v. Schweiker*, 697 F.2d 215, 221 (8th Cir. 1983). *Howard v. Commissioner*, 276 F.3d 235, 239 (6th Cir. 2002).  The ALJ is not required to propound a hypothetical question accepting all claimant's allegations as credible.  *Varley*, 820 F.2d at 780. Rather the hypothetical question must be based upon factual assumptions supported by substantial evidence from the record.  *Id.*  Furthermore, "[t]here must be 'a finding supported by substantial evidence that a claimant has the vocational qualifications to perform specific jobs.'"  *Shelman v. Heckler*, 821 F.2d 316, 321 (6th Cir. 1987); *O'Banner v. Secretary*, 587 F.2d 321, 323 (6th Cir. 1978).  The ALJ had substantial evidence to reject Dr. Winkelman's opinion of disability and to find resumption of work capabilities following meningitis and a recuperative period of less than one year. Accordingly, the ALJ's decision was supported by substantial evidence.

1:06 CV 1703                                    15

## *CONCLUSION*

Based on the arguments presented in the record, the court finds that the Commissioner's decision denying supplemental security income was supported by substantial evidence and is affirmed.

s/James S. Gallas<br>
United States Magistrate Judge

Dated: March 25, 2008